MARY KAY ASH, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 30585-89.      Filed March 11, 1991.

*J. Phillip Adams,* for the petitioner.

*Deborah A. Butler* and *John S. Repsis,* for the respondent.

## OPINION

WRIGHT, *Judge:* This matter is before the Court on petitioner's motion for protective order filed on July 6, 1990. Petitioner seeks a protective order under Rule 103[1] to restrict respondent's use of information obtained through administrative summonses.

By notices of deficiency dated October 10, 1989, respondent determined the following deficiencies in and additions to petitioner's Federal income tax:

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
|------|------------|-----------------|-----------------|-----------|
| | | | Additions to tax | |
| 1983 | $37,060 | $1,853 | [1] | - - - |
| 1985 | 6,608,527 | 330,426 | [1] | $1,652,132 |

[1] 50 percent of the interest due on the deficiencies.

In a petition filed on December 29, 1989, petitioner seeks a redetermination of the deficiencies for both taxable years. Petitioner resided in Dallas, Texas, when she filed her petition. In her petition, petitioner states that on November 29, 1985, petitioner, along with certain other individuals and trusts (the transferors), exchanged Mary Kay Cosmetics, Inc., common stock for: (1) Common or preferred stock of Mary Kay Holding Corp.; and (2) long-term notes of Mary

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Kay Holding Corp. (this transaction will hereinafter be referred to as the exchange).

In the exchange, petitioner received 131,079 shares of Mary Kay Holding Corp. common stock and $10,669,951.10 of long-term notes for 1,399,230 shares of Mary Kay Cosmetics, Inc., common stock. Immediately after the exchange the transferors owned 100 percent of all common and preferred stock of Mary Kay Holding Corp. Petitioner reported on a schedule attached to her Federal income tax return for 1985 that the Mary Kay Holding Corp. long-term notes and common stock were received in a transaction qualifying for nonrecognition treatment under section 351.

On December 5, 1985, MKCI Acquisition Corp. was merged into Mary Kay Cosmetics, Inc. MKCI Acquisition Corp. was a wholly owned subsidiary of Mary Kay Corp., which in turn was a wholly owned subsidiary of Mary Kay Holding Corp. In the merger, the shareholders of Mary Kay Cosmetics, Inc., other than Mary Kay Holding Corp., received cash and debentures of Mary Kay Corp. in exchange for their shares of Mary Kay Cosmetics, Inc. (this transaction will hereinafter be referred to as the leveraged buyout).

After the merger, Mary Kay Cosmetics, Inc., was a wholly owned subsidiary of Mary Kay Corp., which in turn was a wholly owned subsidiary of Mary Kay Holding Corp. Approximately $16,609,890 in expenses was incurred by Mary Kay Cosmetics, Inc., in connection with the leveraged buyout.

During June of 1989, respondent began an examination of Mary Kay Corp.'s Federal income tax return for taxable year 1985. As of the date petitioner's motion for protective order was filed, no notice of deficiency had been issued to Mary Kay Corp.

During August of 1989, respondent began an examination of petitioner's Federal income tax return for taxable year 1985. In his notice of deficiency for taxable year 1985, respondent determined that petitioner had received dividends in the amount of the distributed Mary Kay Holding Corp. notes, or $10,669,951. Respondent also determined that petitioner had received constructive dividends with

respect to $2,626,061 of the MKCI leveraged buyout expenses. With respect to taxable year 1983, respondent determined that as a result of adjustments to taxable year 1985, there was no investment credit carryback to taxable year 1983 as claimed by petitioner on her Federal income tax return for that year.

*The Summonses*

On September 20, 1989, respondent issued an administrative summons pursuant to section 7602 to Lawrence Cox, treasurer of Mary Kay Corp., seeking certain information, testimony, and documents (the MKC summons). The MKC summons relates to the 1985 and 1986 taxable years of Mary Kay Corp. and its subsidiaries. The return date of the summons was October 18, 1989.

On October 3, 1989, respondent issued a third-party recordkeeper summons (see section 7609(a)) to Jack Morris, a partner with the accounting firm of Ernst & Young, seeking certain information, testimony, and documents (the petitioner/Morris summons). The petitioner/Morris summons relates to petitioner's 1985 and 1986 taxable years. The return date of the summons was November 3, 1989.

Also on October 3, 1989, respondent issued another third-party recordkeeper summons to Jack Morris (the Rogers/Morris summons). The Rogers/Morris summons relates to an examination of Richard R. and Janice Z. Rogers' 1985 and 1986 taxable years. Richard R. and Janice Z. Rogers' Federal income tax returns for those taxable years were under examination in relation to the exchange. The testimony, information, and documents sought through the Rogers/Morris summons are identical to those sought by the petitioner/Morris summons. As did the petitioner/Morris summons, the Rogers/Morris summons had a return date of November 3, 1989.

During May and June 1990, respondent issued third-party recordkeeper summonses to officials of Morgan, Stanley & Co., Inc., Merrill Lynch Capital Markets, and Rothchild, Inc. (the adviser summonses), seeking certain testimony, information, and documents relating to Mary Kay Corp.'s 1985 and 1986 taxable years.

On October 18, 1989, the return date of the MKC summons, the treasurer of MKC provided certain documents to respondent, but withheld other documents that MKC concluded are subject to the attorney-client privilege. On November 3, 1989, the return date of both the petitioner/Morris summons and the Rogers/Morris summons, Jack Morris provided to respondent the information requested in the summonses and some of the requested documents. Morris withheld other documents on advice of counsel that such documents are subject to the attorney-client privilege.

On April 12, 1990, respondent commenced an action in the U.S. District Court for the Northern District of Texas to enforce the petitioner/Morris summons and the MKC summons. As of the date of petitioner's motion, no action had been taken to enforce the Rogers/Morris summons or the adviser summonses.

In her motion for protective order petitioner seeks an order prohibiting respondent's attorneys, agents, and employees engaged in representing him before this Court from obtaining access to, reviewing, or using any testimony, documents, or other information obtained pursuant to the MKC summons, the petitioner/Morris summons, the Rogers/Morris summons, and the adviser summonses after December 29, 1989, the date her petition was filed.

## Discussion

As a preliminary matter we note that the enforceability of the summonses is not at issue. The parties agree that the District Court, not this Court, has jurisdiction to decide such issue. Sec. 7604. We therefore do not address the issue of whether the summonses are enforceable.

### I. *Tax Court Rules of Practice and Procedure*

Section 7453 provides that proceedings of the Tax Court shall be conducted in accordance with such rules of practice and procedure as the Court may prescribe. Petitioner argues that respondent's use of administrative summonses to obtain information related to the case pending before this Court allows respondent to undermine the discovery rules contained in title VII of our Rules of Practice and Proce-

dure (Rules 70 through 76) and gives him an unfair advantage. Title VII provides rules addressing interrogatories, production of documents and things, examination by transferees, depositions upon consent of the parties, depositions without the consent of the parties, and deposition of expert witnesses.

The purpose of discovery in the Tax Court is to ascertain facts which have a direct bearing on the issues before the Court. *Penn-Field Industries, Inc. v. Commissioner,* 74 T.C. 720, 722 (1980). Discovery is not as broad in the Tax Court as it is in the Federal District Courts. *Estate of Woodard v. Commissioner,* 64 T.C. 457, 459 (1975). The discovery procedures established by our Rules in essence follow the Federal Rules of Civil Procedure (Federal Rules), but are not identical. See 60 T.C. 1097 (1973) (note accompanying Rule 70(a) (1974), which, for the first time, permitted interrogatories and requests for production and inspection of papers and other things). Thus, absent a Court order, discovery through depositions without the consent of the opposing party is not available under our Rules (with the exception of a deposition taken under Rule 75), as it is under the Federal Rules. That limitation is intentional. See 60 T.C. 1097 (1973). Unnecessarily broad discovery may cause extensive delays and jeopardize the administration, the integrity, and the effectiveness of the internal revenue laws. *Penn-Field Industries, Inc. v. Commissioner, supra* at 724. The discovery procedures should be used only after the parties have made reasonable informal efforts to obtain needed information voluntarily. Rule 70(a)(1); *Branerton Corp. v. Commissioner,* 61 T.C. 691 (1974). Under Rule 103, we may issue orders to protect persons from annoyance, embarrassment, oppression, or undue burden or expense resulting from discovery. Rule 123 allows this Court to impose sanctions, including the exclusion of evidence obtained in direct violation of an existing Court order or the Court's Rules. Rule 1(a) provides that, where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand.

## II. *Authorization to Issue Summonses*

Respondent is authorized by sections 7602 and 7609 to issue summonses and to utilize the information obtained through them. In relevant part section 7602(a) provides that for the purpose of determining the liability of any person for any internal revenue tax the Secretary is authorized: (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; (2) to summon the person liable for tax, any officer or employee of such person, or the person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax, or any other person the Secretary may deem proper, to appear before the Secretary and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and (3) to take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry. Section 7609(a) provides for special procedures when a summons is served on any person who is a third-party recordkeeper.

## III. *Prior Opinions of This Court*

### A. *Universal Manufacturing Co. v. Commissioner*

In arguing that the use of administrative summonses to obtain information relating to the pending case undermines our discovery rules, petitioner relies on *Universal Manufacturing Co. v. Commissioner*, 93 T.C. 589 (1989). In *Universal Manufacturing Co.* the taxpayers were Universal Manufacturing Co., as the successor by merger of WNC Corp. (WNC), and Delbert W. Coleman, the majority shareholder of WNC. In a petition filed with this Court on September 2, 1988, Universal Manufacturing Co. alleged that the Commissioner erred in determining that net operating loss deductions reported for its taxable years ending September 30, 1984, and September 30, 1986, were not allowable under sections 172 and 269. In a petition filed with this Court on December 12, 1988, Coleman alleged that the Commissioner erred in determining that certain moneys which WNC had treated as loans or shareholder advances should have been treated as dividends from WNC.

In *Universal Manufacturing Co.* an agent of the Commissioner's Criminal Investigation Division served summonses on or about January 10, 1989, on two employees of WNC and third-party recordkeeper summonses upon two accountants for WNC. The testimony and documents sought by the Commissioner under those summonses were directly related to the matters at issue in the pending civil cases. The taxpayers moved for a protective order under Rule 103, asserting that the Commissioner's use of administrative summonses to obtain information directly related to the issues of civil cases pending before this Court allowed him to circumvent the discovery rules contained in title VII of our Rules of Practice and Procedure and gave him an unfair advantage in the prosecution of litigation before this Court. The taxpayers urged the Court to exercise its inherent authority over the proceedings to prevent the Commissioner from utilizing in the Tax Court proceedings any information obtained pursuant to those administrative summonses.

In *Universal Manufacturing Co.,* respondent argued that he was entitled to free and unfettered use of information developed through the administrative summonses in question. We noted that respondent chose to issue the notices of deficiency at issue and, in effect, chose to give the taxpayers the opportunity to come to this Court and invoke our Rules before his criminal investigation was completed, even though his internal administrative guidelines seemed to provide that a notice of deficiency normally would not be issued in such a situation. *Universal Manufacturing Co. v. Commissioner, supra* at 594. We went on to reason that the subject motion required us to reconcile two competing considerations. First, this Court has no desire to interfere in any way with respondent's investigations into violations of the internal revenue laws. We noted that respondent has the obligation to initiate such investigations and to pursue them to completion. Second, respondent's use of administrative summonses in a criminal case to interview third-party witnesses and obtain relevant documents concerning the issues in civil cases pending before the Court circumvents our discovery rules. *Universal Manufacturing Co. v. Commissioner, supra* at 594.

After balancing both considerations, the Court found that the Commissioner's use of administrative summonses to interview third-party witnesses and obtain relevant documents concerning the issues in cases pending before the Court impermissibly undermined the Court's discovery rules. The Court held that this was so even if the Commissioner's motives were fully proper. The Court stated its objective in so holding was to "require respondent to present his position in the civil cases pending before us without utilizing any information obtained pursuant to an administrative summons served after the cases were docketed in this Court." 93 T.C. at 595. The Court issued an order providing that the Commissioner was not to "obtain or use any testimony, documents or other information obtained pursuant to an administrative summons served after September 2, 1988," the date the petition to this Court was filed. *Universal Manufacturing Co. v. Commissioner, supra* at 595.

B. *Westreco, Inc. v. Commissioner*

In addition to *Universal Manufacturing Co. v. Commissioner, supra,* petitioner relies on *Westreco, Inc. v. Commissioner,* T.C. Memo. 1990-501. In *Westreco* this Court held that it was justified in issuing a protective order that prevented the Commissioner's lead trial attorney in a docketed case from further participation in an examination of a corporation and its related parties for later years concerning the same issue the Court was set to decide. In addition, the protective order prevented the use of information obtained under administrative summonses in the later years' examination in the trial for the earlier tax years.

The taxpayer in *Westreco* was a second-tier subsidiary of Nestle S.A. Those two corporations and their related corporations were before the Court concerning a section 482 adjustment to the fee for contract research services paid to the taxpayer by its foreign parent corporation for the years 1978 through 1982. As the taxpayer was preparing for trial, the Commissioner was conducting an examination of the income tax returns of Nestle and its related corporations to determine if the section 482 adjustments should be made for the years 1983 through 1985.

In connection with the 1983-85 examination, the Commissioner issued a document request and administrative summonses to the taxpayer's employees. The lead attorney for the Commissioner for the trial concerning the earlier years' adjustments was actively participating in the later years' examination. The taxpayer requested a protective order from this Court, concerned that the summonses and document request might be used to gather information for use in the upcoming trial, thus undermining this Court's discovery rules.

After considering the arguments of both parties, this Court issued the requested order, applying the principles of *Universal Manufacturing Co. v. Commissioner, supra.* The protective order prevented the Commissioner's lead trial attorney from further participation in the later years' examination process and from using any information obtained in that examination in the case that was being readied for trial. The Commissioner was also required to maintain a list of all evidence obtained in the later years' examination so that the Court could protect the integrity of its discovery rules. The Commissioner asked the Court to reconsider its order.

Upon reconsideration, the Court found that the summonses served on petitioner's employees to appear for interviews and deliver documents in the later years' audit were in the nature of discovery depositions. The Court reasoned that the participation of the Commissioner's lead trial attorney for the 1978-82 deficiencies in the 1983-85 examination would give the Commissioner an unfair advantage. The Court viewed the activities of the Commissioner's attorney and the use of later years' summonses as an attempt to undermine the Court's discovery rules.

The Commissioner argued that the Court lacked the power to prevent it from using the information obtained through the summonses and document request. The Court held that its authority came from two sources. One was necessarily implied from the power of the Court to prescribe rules of practice and procedure. The second source of the Court's power was inherent in its obligation as a judicial body to protect the integrity of its processes and to

regulate the proceedings and parties, or the representatives of parties, that appear before it.

The Court made clear that it was not implying that all activities of a trial attorney of the Commissioner in an audit would justify the kind of protective order it had issued in that case. The compelling facts in the case, it said in conclusion, justified the protective order it had issued. The language of the opinion is to be interpreted only in that context.

## IV. *Summonses Issued Prior to Filing of Petition*

With regard to the summonses issued in the instant case before petitioner filed her petition with this Court (MKC summons, petitioner/Morris summons, and Rogers/Morris summons), we find that *Universal Manufacturing Co. v. Commissioner, supra,* is inapplicable. That case involved a summons issued *after* the filing of the petition.

Petitioner argues that we should extend our holding in *Universal Manufacturing Co.* to information obtained after the filing of her petition through the MKC summons, petitioner/Morris summons, and Rogers/Morris summons, which were issued before her petition was filed, because respondent's purpose in issuing them was to undermine this Court's discovery rules. First, we note that relatively few notices of deficiency result in the filing of a petition in this Court. Respondent had no way of knowing whether petitioner would file a petition. In addition, until a petition is filed, we have no basis on which to impose the rules provided for in title VII of our Rules of Practice and Procedure, and any administrative summonses issued by respondent prior thereto do not pose a threat to the integrity of our Rules. Nor will the summonses pose a threat to the administration or effectiveness of our Rules of Practice and Procedure. When the petition was filed, the parties on whom summonses were served were already under an obligation to provide the information called for pursuant to sections 7602 and 7609. Therefore, the competing considerations addressed in *Universal Manufacturing Co.* are not present here. If the summonses are for any reason invalid, petitioner's remedy lies with the U.S. District Court, not here.

We deny petitioner's motion for protective order with respect to the MKC summons, petitioner/Morris summons, and Rogers/Morris summons, which were all served prior to the filing of the petition in this case.

## V. *Summonses Issued After Filing of Petition*

With respect to the adviser summonses, petitioner asks that we grant her motion pursuant to Rule 103. Rule 103 authorizes this Court to restrict the use of discovery procedures or information obtained through discovery when required to protect a party or other person against "annoyance, embarrassment, oppression, or undue burden or expense." As an initial matter, we must address the issue of whether this Rule may be used to restrict a party's use of information which is obtained through means *other than* our discovery rules.

Rule 103 is derived from, and for all practical purposes is identical to, Rule 26(c) of the Federal Rules. 60 T.C. 1057, 1122 (1973). Accordingly, we look to cases construing Rule 26(c) of the Federal Rules for guidance on the breadth of application of Rule 103. *Willie Nelson Music Co. v. Commissioner,* 85 T.C. 914, 917 (1985). Those cases uniformly hold that Rule 26(c) provides no authority for the issuance of protective orders to regulate the use of information or documents obtained through means other than discovery in the proceedings before the Court. *Kirshner v. Uniden Corp. of America,* 842 F.2d 1074 (9th Cir. 1988) (power to control discovery under Rule 26(c) *does not extend* to the issuance of a protective order preventing a party from using material obtained in a separate action, and requiring the party to return the material to the other party, even though the parties to such other action are identical); *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341 (9th Cir. 1984) (Rule 26(c) does not give District Court power to exclude evidence discovered in a *separate* antitrust action, even when such discovery occurs after the District Court's own discovery cutoff date); *Bridge C.A.T. Scan Associates v. Technicare Corp.,* 710 F.2d 940 (2d Cir. 1983) (where information alleged to contain trade secrets was compiled prior to commencement of lawsuit, Rule 26(c) did not give court authority to prohibit its disclosure). Thus, based on these

cases we could conclude that this Court does not have the authority to issue protective orders under such Rule restricting the use of information *which was not obtained through the use of the Court's discovery procedures,* but was obtained through other legal procedures. To the extent that *Universal Manufacturing Co. v. Commissioner,* 93 T.C. 589 (1989), may be read as applying Rule 103 more broadly, we reject such a reading. Because a ruling under Rule 103 would not be definitive here, we do not express a conclusion as to the application of that Rule to the question before us.

That is not to say, however, that this Court is powerless to regulate the processes of this Court, viz, the use in this Court of information obtained by administrative summons. It is undisputed that courts have inherent powers vested in the courts upon their creation and not derived from any statute. *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 561 (3d Cir. 1985) (and cases cited thereat). The Supreme Court has upheld the inherent authority of a court to enter a protective order prohibiting dissemination of information obtained through discovery, *Seattle Times Co. v. Rinehart,* 467 U.S. 20, 35 (1984); to control the conduct of attorneys practicing before it, *Thread v. United States,* 354 U.S. 278, 281 (1957); to correct that which has been wrongfully done by virtue of the court's process, *United States v. Morgan,* 307 U.S. 183, 197 (1939); and, most pertinently, "over their own process, to prevent abuse, oppression and injustice." *Gumbel v. Pitkin,* 124 U.S. 131, 146 (1888).

Moreover, our own rules contemplate questions of practice and procedure for which there is no applicable rule of procedure and direct the Judge before whom the matter is pending to prescribe an appropriate procedure. Rule 1(a).

As we have already stated, *supra,* our Rules of discovery in essence follow the Federal Rules but are not identical. Rule 26(a) of the Federal Rules (Rule 26(a)) allows, generally, nonconsensual discovery by deposition; our Rules do not. To give respondent carte blanche with regard to the admission of evidence obtained by administrative summons would, in effect, give him the full advantage of Rule 26(a), an advantage that we have withheld. We need not do so; we have the power to uphold the integrity of the Court's process by enforcing the limited discovery that, by rule, we

have adopted. Where litigation in this Court has commenced, and an administrative summons is issued with regard to the same taxpayer and taxable year, we will exercise our inherent power to enforce the limited discovery contained in our Rules. We will do so unless respondent can show that the summons has been issued for a sufficient reason, independent of that litigation. Where litigation in this Court has commenced, and an administrative summons is issued not with regard both to the same taxpayer and taxable year (for instance where the summons concerns another taxpayer or a different taxable year), *normally* we will not exercise our inherent power. We will exercise that power, however, when petitioner can show lack of an independent and sufficient reason for the summons. In the instant case, only the adviser summonses were issued after litigation commenced. Those summonses fall within that situation where normally we will not exercise our inherent power. Since petitioner has not shown a lack of independent and sufficient reason for the adviser summonses, we need not exercise our inherent power nor detail how that power could be exercised. Rule 1 authorizes the Judge before whom a matter is pending to prescribe an appropriate procedure. What would be appropriate would depend on how best to maintain control "over [our] own process, to prevent abuse, oppression and injustice." *Gumbul v. Pitkin, supra* at 146.

*Universal Manufacturing Co.* presents the first situation (post-petition summons, same taxpayer, same year), and, we believe, the Court there may have concluded that there was no real prospect of a criminal investigation, although the Court did not make such a finding. *Westreco, Inc.* presents a different situation. The Court there stated that it found compelling facts that justified its protective order but cautioned that no implication was to be drawn that all activities of respondent's trial counsel in an audit would justify a similar order. We note that *Westreco, Inc.* is a memorandum opinion, which followed *Universal Manufacturing Co.* While we have herein modified our opinions in *Universal Manufacturing Co.* and *Westreco, Inc.,* both cases are still pending and the summons issues involved in those cases were decided without the benefit of the standards

articulated herein. We therefore express no view on the outcome of such cases under the standards articulated herein, as such matters are best left to the discretion of the Judge before whom the matter is pending.

Finally, we repeat that the enforceability of the summonses is not here at issue. That is a question for the District Court, and the pendency of a Tax Court proceeding does not deprive the District Court of jurisdiction to determine such enforceability. See *United States v. Gimbel,* 782 F.2d 89, 93 (7th Cir. 1986); *Bolich v. Rubel,* 67 F.2d 894, 895 (2d Cir. 1933).

We next consider petitioner's argument that this Court's power to exclude the evidence in question is inherent in its obligation as a judicial body to protect the integrity of its processes and to regulate the proceedings and parties that appear before it. We already have discussed the circumstances that would allow us to regulate the proceedings as requested by petitioner and, based on the record before us, we find that the summonses *in issue* are not a threat to the integrity of this Court's processes. The development of additional evidence through the summonses *in issue* will in fact benefit this Court's processes because it will result in a more fully developed factual background in which to consider petitioner's case. The additional evidence may also lead to the settlement of the case.

We also find that we are not compelled to grant petitioner's motion in order to regulate the proceedings and parties that appear before us. Our holding in this case that a protective order is not appropriate involves legitimate and good faith summonses with respect to other years, to related taxpayers, and to related tax liabilities, and involves the absence of any other underlying facts or circumstances that would justify the issuance of a protective order in this case. Petitioner has failed to show respondent's lack of an independent and sufficient reason for the summonses. The rule we announce herein in no way limits this Court's exercise of its power to issue protective orders or to impose other appropriate sanctions where the underlying facts and circumstances of a particular case establish an abusive or prejudicial situation that warrants relief. If, as we proceed, an abusive or prejudicial situation becomes apparent (which

petitioner has so far not shown), we will be able to regulate the proceedings regardless of the rule we announce herein.

We also note that while this Court must, of necessity, control the admission of all evidence in the pending proceeding, any proceedings regarding the enforceability of the administrative summonses will be brought before the Federal District Court, not this Court. On the other hand, if we were to grant petitioner's motion with respect to the adviser summonses, we would then have to supervise the administrative summons process, in order to insure that none of the evidence obtained through that process was introduced into the case. The necessity of such supervision may make the regulation of the case more difficult rather than more efficient.

In conclusion, we deny petitioner's motion for protective order. With regard to each of the summonses other than the adviser summonses, we do so since all were issued prior to commencement of the litigation herein. With regard to the adviser summonses, we do so since petitioner has not shown a lack of a sufficient, independent reason for their issuance.

In light of the foregoing,

*An appropriate order will be issued.*

Reviewed by the Court.

NIMS, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, GERBER, JACOBS, PARR, WELLS, COLVIN, and HALPERN, *JJ.*, agree with the majority opinion.

WHALEN, *J.*, concurs in the result only.

---

CHABOT, *J.*, concurring in the result: I agree with the majority's ruling denying petitioner's motion for a protective order regarding certain administrative summonses.

My concern is that there seems to be a search for reasons to exclude information developed through administrative summonses while at the same time courts accept information developed through violations of people's constitutional rights. Respectfully, I suggest that we are standing public policy on its head when we approach the lawful statutory

administrative summons with as much, or more, suspicion than we do violations of constitutional rights.

In dealing with disputes about excludability of evidence obtained in violation of people's rights under the United States Constitution, the Supreme Court has frequently stressed the undesirability of excluding from evidence information that may be reliable and important in enabling the triers of fact to decide correctly the cases that are before them.[1] The Supreme Courthas nevertheless concluded that it is desirable to exclude otherwise admissable, reliable, and persuasive evidence where such exclusion would serve to deter future violations of rights guaranteed by the United States Constitution. Even then, limitations have been placed on the circumstances in which such exclusions will be authorized. (See, e.g., our recent discussion in *Houser v. Commissioner,* 96 T.C. 184 (1991).)

Another area in which evidence is excludable, even though it may be highly reliable and persuasive, is under Rule 6(e),

---

[1]Justice Powell summarized many concerns in *Stone v. Powell,* 428 U.S. 465, 489-491 (1976), as follows:

The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman:*

"A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty." 394 U.S., at 237.

Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.[30] * * *

[Some fn. refs. omitted.]

---

[30]In a different context, Dallin H. Oaks has observed:

"I am criticizing, not our concern with procedures, but our preoccupation, in which we may lose sight of the fact that our procedures are not the ultimate goals of our legal system. Our goals are truth and justice, and procedures are but means to these ends. . . .

"Truth and justice are ultimate values, so understood by our people, and the law and the legal profession will not be worthy of public respect and loyalty if we allow our attention to be diverted from these goals." Ethics, Morality and Professional Responsibility, 1975 B.Y.U.L. Rev. 591, 596.

Fed. R. Crim. Proc. In those situations, the greater benefit that is sought to be obtained is that which is understood to lie in the secrecy of the grand jury.

When we get beyond these situations, we find another command. This is the command in the Federal Rules of Evidence, as enacted by the Congress, that "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Rule 402, Fed. R. Evid.

Historically, this Court's approach to discovery has been to insist on the parties' exchanging the relevant information informally and agreeing to inclusions of evidence (where parties' disputes are not settled) by the stipulation process. This Court has not been willing to institute the bulk of the formal discovery procedures that appear to cause such extraordinary expenses, gamesmanship, and injustices in some courts. Accordingly, except for the procedures in titles VII and VIII of the Tax Court Rules of Practice & Procedure, this Court has not afforded the parties the right of Court-enforced nonconsensual discovery. By the same token, this Court has not ordinarily sought to interfere with the opportunities of the parties to obtain information. On the contrary, this Court's focus on the stipulation process has been designed to push the parties to voluntarily provide each other with information relevant to the case at hand.

Accordingly, as I see it, it should be an unusual circumstance for this Court to forbid a party to acquire information or use information that it has acquired unless the information has come from constitutional violations, violations of grand jury secrecy, or violations of some other public policy which is of such importance that it overrides the importance of facilitating the presentation of reliable, persuasive, and otherwise admissible evidence to the trier of fact.

The administrative summons, the effects of which petitioner seeks to insulate herself from in the instant case, is not a creature of court rules but is, rather, authorized specifically by statute. The Congress has prescribed respondent's statutory authority and has specified the tribunals in

which that statutory authority is to be tested. Those tribunals do not include this Court.

There may be circumstances in which we may conclude that there has been such an abuse with regard to an administrative summons that we might restrict the use of information obtained thereby. However, the fact that the information was obtained by an administrative summons surely should not itself be a ground for restriction or even a ground for suspicion. The administrative summons is a tool specifically authorized by the Congress. The policy considerations of the administrative summons have been examined and reexamined by the Congress on many occasions. The Congress has changed its mind on many occasions. Whatever the policy balances may be at any particular time, they are for the Congress to determine. I submit that, for our purposes, we are obligated to take the administrative summons as a fact of life; we should do so not because we agree with the Congress' policy but, rather, because the Congress has exercised its constitutional authority and we must follow it (just as we must follow the Congress' decisions as to inclusion of income, deductions of expenses, allowances of credits, and the 90-day period for petitioning the Tax Court).

Respectfully, I suggest that those who are concerned about "a level playing field" should take their legitimate concerns to a different forum—the U.S. Congress. In the meanwhile, I would approach respondent's use of the administrative summons with no more suspicion than any party's use of any method of gathering information that does not require this Court's compulsory process. I would be vigilant to prevent abuse, but I would require the complaining party to explain where the abuse lies, especially if the complaining party seems to be reluctant to provide relevant information as part of this Court's stipulation process.

PARKER, SWIFT, and RUWE, *JJ.*, agree with this concurring opinion.

---

SWIFT, *J.*, respectfully concurring. I believe that further explanations are appropriate (1) of the reason the rule implicit in *Universal Manufacturing Co. v. Commissioner,*

93 T.C. 589 (1989), and *Westreco, Inc. v. Commissioner,* T.C. Memo. 1990-501, for the issuance of protective orders needs to be modified, and (2) of how the Tax Court's traditional informal stipulation and discovery process should operate in the large cases.

(1) The opinions in *Universal Manufacturing Co.* and *Westreco* did not analyze or weigh the underlying facts and circumstances relevant to motions for protective orders. Rather, they weighed the principles and structure of tax audit and tax administration (particularly the IRS summons authority) against the principles and structure of tax litigation (particularly Tax Court discovery). Those opinions, erroneously in my view, concluded that the latter is preeminent (at least in the context of a pending court case) and that there exists a fundamental and per se unfairness when the IRS attempts to utilize its statutory authority under the audit rules with respect to related taxpayers, other years, or other liabilities, at the same time that a taxpayer is involved in a pending tax case.

In *Universal Manufacturing Co.,* in *Westreco,* and in the instant case, we are faced with respondent's specific and express statutory authority and responsibility under sections 7602 and 7609 to conduct civil and criminal audits for any and all years and for all taxpayers. See, for example, sec. 7602(c)(3).[1] That authority (which includes the summons power) is separate and distinct from the discovery rules of this Court, is not limited by the Rules of this Court, and unless that authority is clearly abused, this Court, in my opinion, has no business directly or indirectly interfering with the manner or method by which respondent utilizes that authority.

The motions for protective orders in *Universal Manufacturing Co., Westreco,* and the instant case, are in my opinion premature. They ask us to rule on the use of information before we even know what the information is, what form it takes, and before it is offered into evidence.

Under Fed. R. Evid. 402, all relevant evidence is generally admissible except as otherwise provided by the Constitu-

---

[1]Sec. 7602(c)(3) provides as follows:

(3) TAXABLE YEARS, ETC., TREATED SEPARATELY.—For purposes of this subsection, each taxable period (or, if there is no taxable period, each taxable event) and each tax imposed by a separate chapter of this title shall be treated separately.

tion, statute, other provisions of the Rules of Evidence, or other rules prescribed by the Supreme Court. None of those exceptions apply to the facts of *Universal Manufacturing Co., Westreco,* or the instant case.

Section 6103(h) states that information obtained by the IRS through the use of administrative summonses is excepted from the general rules of nondisclosure where it is to be used in subsequent and related court litigation. If the per se rule set forth in *Universal Manufacturing Co.* and *Westreco* were correct, section 6103(h) would be rendered meaningless with regard to litigation in the Tax Court.

Further, the discovery rules of this Court were never intended to be used as a vehicle to limit the admissibility of otherwise relevant information. As discussed below, it is exactly this type of information (i.e., relevant information that has been lawfully obtained) that the Tax Court traditionally has required a party to produce informally under the *Branerton* rule and to include in a stipulation. See *Branerton Corp. v. Commissioner,* 61 T.C. 691 (1974); Rule 91(a).

Lastly, even if the use of a summons were to be viewed as a means of acquiring information not available under our rules, it does not necessarily follow that suppression of evidence is a proper remedy. Suppression of evidence, even if predicated on a court's supervisory powers, has been restricted to those areas where the remedial objective of suppressing evidence (namely, the deterrence of future illegal activity) is most efficaciously served, and suppression must be balanced against the undesirable effect of impeding the fact finding process. *United States v. Payner,* 447 U.S. 727 (1980).

In this case, as in *Universal Manufacturing Co.* and *Westreco,* there has been no finding that respondent committed any illegal or wrongful act in serving the summonses. Also, most of the summonses in this case requested third parties to produce information. In *Payner,* the Supreme Court held that even information that was stolen from a third party in violation of the Fourth Amendment to the Constitution should not necessarily be excluded from evidence in a case in which the third party is not a participant. See *United States v. Payner,* 447 U.S. at 735 n.

7; *Dixon v. Commissioner,* 90 T.C. 237, 245 (1988), following *Payner* on this point.

Assuming a protective order is justified in a case, a further significant question is raised by the broad protective orders that were issued in *Universal Manufacturing Co.* and *Westreco,* and by the protective order requested in the instant case, concerning the proper nature, scope, and extent of protective orders. A discussion of that question is perhaps best left for another day, but the failure of the majority opinion herein to address that question, in my opinion, should in no way be construed as an implicit approval of the nature, scope, or extent of the particular protective orders issued in *Universal Manufacturing Co.* and *Westreco.*

(2) The discovery issue involved in *Westreco Inc. v. Commissioner, supra,* in *Universal Manufacturing Co. v. Commissioner, supra,* and in the instant case, directly and significantly affects the litigation and resolution in the Tax Court of our largest and most complicated cases. Indeed, the cumulative deficiencies determined by respondent in just the three cases mentioned are approximately $33 million (with millions more involved in other years). Taxpayers most interested in this issue are likely to be major international corporations that have entered into multi-issue, multi-year transactions. Recently published news and legal articles indicate that the significance of this issue, as it relates to litigation of the large tax cases, has not been lost on the Government, the private bar, the media, or the general public.

In light of the above, I respectfully suggest that it is especially appropriate to provide at this time to the litigants in this Court additional guidance concerning the continued viability or lack thereof of the Tax Court's traditional informal stipulation and discovery process in the context of the large cases that are now being filed and that will be filed in the years ahead.

Routinely and particularly with regard to major clients, accountants, and lawyers (in preparing tax returns, in giving accounting and legal advice, and certainly prior to litigating a case) investigate what information from related taxpayers and from other years of their clients is relevant

to the current year returns, or to the pending transaction, controversy, or litigation. It would thus appear to be prima facie fair and appropriate that respondent's agents and counsel, in the large complex tax cases, also have a keen interest in investigating and obtaining information from related taxpayers and from other years that may be relevant to the issues in a pending case.

Similarly, to the extent information from related taxpayers and from other years of the same taxpayers, in fact, is relevant to issues pending before us, this Court in my opinion should have the same interest in such information.

How then, in the large cases, is relevant information from related taxpayers and from other years to be discovered for use in this Court?

I believe that even in the large cases counsel for both parties generally should continue to utilize this Court's informal stipulation and informal discovery process to develop such information. See *Branerton Corp. v. Commissioner*, 61 T.C. 691 (1974); Rule 91. Where an appropriate *Branerton* request has been made by either counsel for relevant information pertaining to related taxpayers or to other years, opposing counsel, if they already have the responsive information, should turn over such information informally and completely. If they do not have such information and do not know if it exists, opposing counsel should undertake an investigation to determine whether the information exists and whether it is in their client's custody or control, followed by an appropriate informal and complete disclosure of all information found.

Where—in large cases and in connection with a complete and thorough development of the relevant facts—counsel believes that there is a need to question certain key witnesses or potential witnesses of the opposing party, counsel should proceed under *Branerton* to request an informal meeting with such individuals and with opposing counsel. Where an informal meeting cannot be agreed to and where the individuals in question do indeed appear to be key witnesses and to have been in a position to have particular insight into the relevant information or transactions at issue in a pending case, I would normally expect both counsel to agree, in such situations, to consensual

depositions under Rule 74, thereby obviating the need for the Court to rule on a motion for nonconsensual depositions under Rule 75.

Where consensual depositions under Rule 74 cannot be agreed to, counsel should contact the Court to discuss the appropriateness of formal depositions. I suggest that the Court, in the large cases, and in such situations, should not be as hesitant as it has been in the past to order third-party nonconsensual depositions under Rule 75.

The approach suggested herein emphasizes the Tax Court's strong interest in deciding cases based on all relevant information, and it would provide guidance to counsel in the large cases regarding how that information generally is to be developed. It reaffirms the Tax Court's continued use and primary reliance on good faith, reciprocal, and complete informal discovery, even in the large, complex cases. It recognizes and suggests that some increase in the use of depositions under Rules 74 and 75 may be appropriate in the large cases, and it would appear to minimize potential abuses of respondent's summons authority in connection with pending cases.

PARKER, GERBER, and RUWE, *JJ.*, agree with this concurring opinion.